UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
RAFFAELE OCELLO,

                Plaintiff,

    -against-

THE CITY OF NEW YORK, GATES
CONSTRUCTION CORPORATION,
GREAT LAKES DREDGE AND DOCK
COMPANY, LLC, and HARRIS STRUCTURAL     **MEMORANDUM & ORDER**
STEEL COMPANY, INC.,

                                      05-CV-3725 (SLT) (JO)

                Defendants.
------------------------------------------------------------x
GREAT LAKES DREDGE AND DOCK
COMPANY, LLC,

                Third-Party Plaintiffs,

    -against-

HENNINGSON DURHAM & RICHARDSON
ARCHITECT AND ENGINEERING,
P.C./DANIEL FRANKFURT, now d/b/a
HENNINGSON, DURHAM & RICHARDSON,
P.C., and DANIEL FRANKFURT P.C. AND
WHITE MARINE, INC.,

                Third-Party Defendants.
------------------------------------------------------------x
**TOWNES, United States District Judge.**

        This litigation arises out of injuries sustained by Plaintiff Raffaele Ocello on March 9, 2005, while he was employed at the St. George Terminal in Staten Island, New York. On October 2, 2008, Ocello settled his claims with Great Lakes Dredge & Dock Company ("Great Lakes"), for $2.5 million and discontinued the action against the City of New York (the "City") and the other corporate defendants, including Gates Construction Corporation ("Gates"). All Gates and Great Lakes (collectively, "G&GT")[1] cross-claims against third-party defendants have similarly been dismissed, except those against the City, which now moves for summary

---

[1]     Gates has been acquired by Great Lakes. (<u>See</u> Docket No. 253 at 1).

judgment primarily on the jurisdictional ground that Ocello did not qualify as a "seaman" under the Jones Act.

I. BACKGROUND

    A. Facts

The following facts are taken from the parties' statements pursuant to Local Civil Rule 56.1 Statements, many of which are in dispute. Citations refer to the same paragraphs in each party's statement.

Ocello, an employee for the City's Department of Transportation ("DOT"), was injured on March 9, 2005, when a piece of the upper apron at Slip 4 fell and hit him on the head while aboard the ferry. (56.1 Stmt. ¶ 1). He began working for DOT in either 1981 or 1982, under various job titles. (56.1 Stmt. ¶ 2). At the time of the incident, Ocello states that he held the title of "permanent mate," while the City uses the term, "port mate." (56.1 Stmt. ¶¶ 2, 3, 4). The City maintains that Ocello reported directly to the port captain, maintained an office at the terminal, and that his duties "were primarily shore side," such as:

> coordination and distribution of navigational and USCG information, performing daily inspections of vessel cleanliness, checking firefighting and emergency equipment prior to vessels being placed in service each day, assisting with preparations, attendance and corrective action resulting from Coast Guard quarterly and annual inspections.

(56.1 Stmt. ¶ 5). G&GL agree that Ocello performed these duties, but dispute their characterization as "primarily shore side," and contend that after 9/11, Ocello was also assigned as a regular crew member – with all attendant functions – in the City's ferry fleet two to three days out of his five-day work week. (56.1 Stmt. ¶ 5). Chris Covella, the captain of the vessel on the date of Ocello's injury, testified that during the eleven years they worked together, Ocello "spent a substantial amount of time on these vessels" and the work he performed was

"important" to their function. (56.1 Stmt. ¶ 5). The City states, to the contrary, that Ocello only worked as a crew member on "some occasions" to cover an absence. (56.1 Stmt. ¶ 10).

According to Ocello's sworn statements, on the days he was not working as a regular crew member, he still spent approximately three hours aboard a vessel in the City's fleet, hours "not recorded on any time sheet, but . . . a part of his job function as a mate." (56.1 Stmt. ¶ 5). Additionally, Ocello states that he was required to ride the ferry once each day from Staten Island to Manhattan, a trip that took "at least one hour." (56.1 Stmt. ¶ 5). Ocello's regular shift was Monday through Friday, from 5 a.m. to 1 p.m. (56.1 Stmt. ¶ 6). The City indicates that Ocello worked "additional hours . . . on occasion," but Ocello contends that he "worked approximately eight to fourteen hours of overtime each week." (56.1 Stmt. ¶ 6). Moreover, G&GL dispute the City's statements and documents related to record keeping. (56.1 Stmt. ¶¶ 7, 8). Specifically, G&GL challenge the City's reliance on the "Form 12 Daily Sheets" as a complete and accurate record of when Ocello worked as a crew member. (56.1 Stmt. ¶ 9). On the day of the incident, Ocello was working as a mate aboard a ferry because the assigned mate had died. (56.1 Stmt. ¶ 11). As to the failed structure, the parties agree that the City entered into a contract with Gates in 1995 to serve as the general contractor of a multi-million dollar project involving the emergency reconstruction of Slip 4 at the terminal, including fabrication and installation of a new upper apron. (56.1 Stmt. ¶¶ 12, 13). They dispute, however, the findings of the accident reports and the interpretation of certain contractual provisions relating to indemnification and liability. (56.1 Stmt. ¶¶ 15, 16).

### B. Procedural History

On August 5, 2005, Ocello commenced this action against the City pursuant to the Jones Act, 46 U.S.C. § 688, for the injuries he sustained while offloading passengers at the Staten Island Ferry terminal. (Docket No. 1). He subsequently added Gates, Great Lakes, and others as

defendants to his fourth cause of action. (Docket No. 20). In answer to the amended complaint, G&GL alleged certain cross-claims against their co-defendants. (Docket No. 27). On March 21, 2008, in response to certain conduct during discovery, Judge Charles P. Sifton[2] sanctioned G&GL by striking their answer and entering a default in favor of Ocello. (Docket No. 145). Judge Sifton's striking the answer had the effect of also dismissing G&GL's cross-claims against the City and other co-defendants. The Second Circuit ultimately reinstated these cross-claims, which are the subject of the instant motion. (Docket No. 195 at 7). While awaiting the Second Circuit's decision, G&GL entered into a $2.5 million settlement agreement with Ocello, who released his claims against the City and all other defendants. (Docket No. 191 ¶¶ 1, 5). G&GL thereafter settled its cross-claims against all third-party defendants, except the City. (Docket No. 254). G&GT's surviving cross-claims against the City include (1) common law contribution and (2) contractual obligation of the City to name G&GT as additional insureds.[3] (Docket No. 27 at 5-7).

The City now moves for summary judgment, arguing that as a threshold matter the Court lacks jurisdiction over the underlying action because Ocello was not a "seaman" under the Jones Act and because G&GT's cross-claims are governed by (and fail under) state law. (City Mem. at 2, 14-15). In response, G&GT argue that the submissions evince at least an issue of fact regarding Ocello's purported "seaman" status and that even if the Court finds the Jones Act inapplicable, the cross-claims for contribution and contractual obligation should still be considered under general maritime law. (G&GT Opp. at 1)

II. DISCUSSION

---

[2]  This case was reassigned to me on January 31, 2011. (Docket No. 244).

[3]  G&GT have indicated they are "not pursuing a claim for contractual indemnity against the City at this time," which was originally included as a cross-claim. (Opp. Mem. at 21 n.6)

4

A. Legal Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Doninger v. Niehof, 642 F.3d 334, 344 (2d Cir. 2011). The movant's burden is met "if it can point to an absence of evidence to support an essential element of the nonmoving party's claim." Pavel v. Plymouth Management Group, Inc., 198 Fed. Appx. 38, 40 (2nd Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). Should the movant carry this burden, the non-movant "must come forward with evidence that would be sufficient to support a jury verdict in his favor." Goenaga v. March of Dimes Birth Defects Found, 51 F.3d 14, 18 (2d Cir. 1995). The non-movent cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990) (internal citations and quotation marks omitted). Importantly, a court's role "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Goldberg & Connolly v. N.Y. Cmty. Bancorp, Inc., 565 F.3d 66, 71 (2d Cir. 2009).

**B. Jurisdiction**

**1. Jones Act**

As a threshold issue, the City argues that this Court never had jurisdiction because Ocello was not entitled to bring suit under the Jones Act. The statute provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury." 46 U.S.C. App. § 688(a) (emphasis added). It is well known that the Jones Act itself does not define that term, see Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000), but the Supreme Court has ultimately recognized two requirements for "seaman" status: (1) "an employee's duties must contribute to

the function of the vessel or to the accomplishment of its mission," and (2) the employee "must have a connection to a vessel in navigation that is substantial in terms of both its duration and its nature." Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995) (internal quotation marks, bracketing, and ellipses omitted).

The first prong concerns "the plaintiff's employment at the time of the injury." O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 63 (2d Cir. 2002). A putative seaman need not "aid in navigation or contribute to the transportation of the vessel, but [he] must be doing the ship's work." McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355 (1991). The Supreme Court has indicated that "this threshold requirement is very broad" and that "[a]ll who work at sea in the service of a ship are eligible for seaman status. Chandris, 515 U.S. at 368. (emphasis in original). The City concedes that Ocello's duties as of the date of the incident would meet this standard. (City Mem. at 9 n.4).

The parties' dispute therefore centers on whether Ocello satisfies the second Chandris prong. It is a "status-based" inquiry, so that "[l]and-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." Chandris, 515 U.S. at 361. To aid courts in their assessment of a plaintiff's temporal connection, the Supreme Court has adopted from the Fifth Circuit a general rule of thumb that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." Chandris, 515 U.S. at 371; see Roberts v. Cardinal Servs., Inc., 266 F.3d 368, 376-77 (5th Cir. 2001) ("A worker who aspires to seaman status must show that at least 30 percent of his time was spent on vessels, every one of which was under his defendant-employer's common ownership or control.").

Whether an employee qualifies as a seaman "is a mixed question of law and fact." O'Hara, 294 F.3d at 63-64 (quoting Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554 (1997)). Summary judgment is appropriate "where the facts and the law will reasonably support only one conclusion." Wilander, 498 U.S. at 356. If, however, "reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury." Chandris, 515 U.S. at 369.

In this case, the City alleges that "Ocello spent 88% of his working time shore side and 12% of his working time on board ferryboats as a substitute vessel deckhand or mate." (City Mem. at 12). The City relies on "Form 12" records that purportedly show the time Ocello worked aboard a ferry as a mate. (Decl. of Brian Walsh, dated Oct. 11, 2001, Ex. 1). According to these records for the period of September 1, 2004, through March 9, 2005, Ocello worked 144.2 hours on a vessel and 1029.3 hours shoreside. (City Mem. at 5). The City also contends that the nature of Ocello's work would not qualify him as a seaman under the Jones Act.

G&GL disputes these facts, arguing that after 9/11, Ocello "was assigned 2-3 days out of [his] 5 day work week as a member of the crew of one of the several vessels in the City's fleet of ferries," and that his duties included "hooking up the boats, opening the gates to facilitate passenger disembarkation, supervising deck hands, and all other similar functions traditionally performed by crew members." (Decl. of Raffaele Ocello, dated Nov. 21, 2011 ("Ocello Decl."), ¶¶ 4, 5). On the other days, Ocello stated he spent "at least 4 of [his] 8 work hours" actually aboard various ferries." (Ocello Decl. ¶ 7). Three of the four hours, during which Ocello performed inspections, "were not recorded on any time sheet, but were a part of my regular job function." (Ocello Decl. ¶ 7). The remaining hour, during which Ocello "was also required to ride the ferry one time each day from Staten Island to New York City . . . was recorded; however, the form on which this trip was recorded was not included" in the City's exhibits.

7

(Ocello Decl. ¶7). Ocello also maintained that many Form 12 documents were absent from the City's production and his overtime hours were not accounted for. (Ocello Decl. ¶ 10). As noted, Chris Covella, the captain of the vessel on the date of Ocello's injury, testified that during the eleven years they worked together, Ocello "spent a substantial amount of time on these vessels" and the work he performed was "important to the function of the vessel." (Decl. of Robert G. Clyne, dated Nov. 22, 2011, Ex. A at 42). Indeed, it is G&GL's position that Ocello spent at least 70% of his time performing duties that would qualify him as a seaman under the Jones Act. (G&GT Opp. at 16).

In sum, there are material facts clearly in dispute as to the duration and nature of Ocello's work, and it is not the Court's role to resolve them here.[4]

### 2. General Maritime Jurisdiction

G&GL argue, however, that even if jurisdiction pursuant to the Jones Act is lacking, Ocello's action is governed by federal maritime law, which should extend to the surviving cross-claims. (G&GL Opp. at 22). As an initial matter, it is worth noting that G&GT are named as defendants only in Ocello's fourth cause of action:

> That the liability of Defendants arises from a nonelegable duty; the doctrine of respondeat superior; and the reckless disregard of Defendants for the safety of others within the meaning of CPLR 1602; and accordingly to the extent that limited liability would impair, modify, abrogate or restrict the right of Plaintiff as against said Defendants, the Defendants are not entitled to invoke the limited liability provision of Article 16 of CPLR.

(Am. Compl. ¶ 50).[5] Despite the fact that Ocello has invoked only state law provisions here, G&GT argue that general maritime law should govern this claim – and therefore also govern the

---

[4] G&GT have also asked the Court to strike several of the City's submissions as inadmissible. (Docket No. 278). The Court does not reach this question, as it has found summary judgment inappropriate even with consideration of these documents.

[5] In fact, Jones Act jurisdiction may not, ultimately, be the determinative issue because G&GT are not named as defendants in the causes of action brought pursuant to that statute.

cross-claims for contribution now before the Court. G&GT are correct to point out that federal courts often apply maritime law in actions that do not explicitly raise it as a basis for jurisdiction. For example, even where a complaint invokes only diversity jurisdiction, "district courts nevertheless apply substantive maritime law where there is admiralty jurisdiction." Franco Apparel Group, Inc. v. Nat'l Liab. & Fire Ins. Co., No. 10 Civ. 8205 (RJS), 2011 WL 2565287, *2 n.3 (S.D.N.Y. June 28, 2011) (citing Preston v. Frantz, 11 F.3d 357, 358-59 (2d Cir. 1993)). Accordingly, the salient questions are (1) whether Ocello was entitled to admiralty jurisdiction over his fourth cause of action and, if so, (2) whether maritime law extends to the cross-claims for contribution.

As to the first question, it is true that a plaintiff injured in the course of employment and not covered by the Jones Act or the Longshore and Harbor Workers Compensation Act ("LHWCA")[6] "may still recover under an applicable state workers' compensation scheme, or, in admiralty, under general maritime tort principles." Chandris, 515 U.S. at 356. G&GT contend that Ocello's amended complaint pleaded facts sufficient to demonstrate (1) that the incident "occurred on or over 'navigable waters'"; and (2) that "the activity giving rise to the incident . . . had a substantial relationship to traditional maritime activity, such that the incident had a potentially disruptive influence on maritime commerce." Vasquez v. GMD Shipyard Corp., 582 F.3d 293, 298 (2d Cir. 2009) (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995)). There is little doubt (and the City does not appear to contest) that the incident occurred on navigable waters. As to the second prong, G&GT correctly note that the "inquiry does not turn on the actual effects on maritime commerce" arising from the

---

[6] As noted in O'Brien v. City of New York, 822 F. Supp. 943, 950 (E.D.N.Y. 1993), the City of New York is immunized from suit under the LHWCA pursuant to 33 U.S.C. § 903(b), which provides that "[n]o compensation shall be payable in respect to a disability or death of an officer or employee of the United States, or any agency thereof, or of any State or foreign government, or any subdivision thereof."

tortious incident, but rather on the "potential disruption to commercial maritime activity." Sisson v. Ruby, 497 U.S. 358, 363 (1990) (emphasis in original). Courts have typically found incidents involving ferry transport to qualify as traditional maritime activity with such potential effects. See, e.g., McMillan v. City of New York, Nos. 03-CV-6049, 08-CV-2887, 2008 WL 4287573, at *3 (E.D.N.Y. Sept. 17, 2008) (injury occurred aboard ferry en route to Staten Island terminal); Cochran v. A/H Battery Associates, 909 F. Supp. 911, 917 (S.D.N.Y. 1995) (injury occurred on Hudson River ferry about to moor). Accordingly, Ocello arguably was entitled to maritime jurisdiction over his fourth cause of action.

The second question regarding contribution is far more complicated. The City contends that Ocello was not covered by the Jones Act or the LHWCA, and that because he "would have been compensated through workers compensation . . . [a] resort to general maritime law is not appropriate" for G&GT's cross-claims. (City Reply at 7). The City cites no case law for this proposition, nor does it provide citations for its assertion that "a review of the case law confirms that this type of claim is usually reserved for a plaintiff who falls well outside the coverage of the Jones act or the LHWCA." (City Reply at 7). Nevertheless, courts in this circuit have recognized that the "exercise of admiralty jurisdiction . . . does not result in automatic displacement of state [statutory] law." Vasquez v. FCE Industries, Ltd., No. 07-CV-1121 (FB) (JO), 2008 WL 4224396, at *4 (E.D.N.Y. Sept. 10, 2008) (quoting Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 206 (1996)). Indeed, "admiralty courts may refer to state law that neither contravenes a clearly established rule of general maritime law nor impairs a principle of national maritime uniformity." Roane v. Greenwich Swim Comm., 01 Civ. 2254, 2004 WL 943572, *1 (S.D.N.Y. Apr. 30, 2004); see Just v. Chambers, 312 U.S. 383, 388 (1941) (court must consider whether "state action is . . . hostile to the characteristic features of the maritime law or inconsistent with federal legislation."). The City argues that state law should apply here,

such that G&GT's contribution cross-claims are barred by New York's Workers' Compensation Law § 11 and N.Y. Gen Oblig. Law §15-108(c).

Resolving conflicts between state and maritime law is not an easy task. See American Dredging Co. v. Miller, 510 U.S. 443, 452 (1994) ("It would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible . . . or . . . even entirely consistent within our admiralty jurisprudence."). With regard to this case, there is little precedent involving an employee plaintiff who alleges a general maritime negligence claim and who does not qualify for benefits under either the Jones Act or the LHWCA. To the extent that courts have addressed the conflict between worker's compensation laws and general maritime law, an enduring split has emerged. The Eleventh Circuit applies a balancing test, weighing the "comparative interests" between state and maritime law on a case-by-case basis to determine whether a worker's compensation law bars an injured employee's maritime negligence claim. See Brockington v. Certified Elec., Inc., 903 F.2d 1523, 1530 (11th Cir. 1990) ("[F]ederal courts sitting in admiralty should . . . acknowledge and protect state-created rights, even at times to the exclusion of an existing maritime law."). The Fifth and Ninth Circuits have adopted a stricter approach, holding that a state worker's compensation regime cannot bar a plaintiff from pursuing a general maritime negligence claim. Green v. Vermilion Corp., 144 F.3d 332, 341 (5th Cir. 1998); Chan v. Society Expeditions, 39 F.3d 1398, 1402 (9th Cir. 1994). The Second Circuit has not addressed this issue, nor have its district courts.[7] See Morrow v. MarineMax, Inc., 731 F. Supp. 2d 390, 396 (D.N.J. 2010) (reviewing Supreme Court and three Circuit Court decisions addressing "conflict between a general maritime negligence claim and a state's

---

[7] In a recent maritime case, a New York state court chose to employ the Brockington approach, finding that even if general maritime jurisdiction applied to third-party indemnification and contribution claims, "preemption of Worker's Compensation law § 11 is not compelled." Durando v. City of New York, No. 52181, 2011 WL 6115751, at *23 (N.Y. Sup. Dec. 5, 2011) (citing Cammon v. City of New York, 95 N.Y.2d 583, 590 (N.Y. 2000)).

workers' compensation law"). Given the extremely unsettled nature of this area and the City's failure to provide substantive support for its position that New York's Workers' Compensation Law § 11 preempts federal maritime law, summary judgment is denied on that ground.

Yet, even assuming § 11 does not apply, it does not necessarily follow that G&GT's cross-claims for contribution would survive. New York law also provides that a "tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person." N.Y. Gen Oblig. Law §15-108(c); see <u>DMJ Assocs. v. Capasso</u>, No. 97-CV-7285, 2008 WL 4515799, at *2 (E.D.N.Y. Oct. 2, 2008) ("Courts should bar third-party contribution claims brought by settling defendants who, by settlement with the plaintiff, effectively avoided any further litigation of the claims against them." (internal quotation marks and bracketing omitted)). The City offers the rather circular reasoning that because New York law applies, New York law should apply to bar the cross-claims, citing several state cases which do not involve maritime jurisdiction. (City Mem. at 15-16). In response, G&GT offer several admiralty cases in which maritime law was applied instead of §15-108(c). (G&GT Opp. at 21-22). Although it is possible to distinguish them (three involve plaintiffs explicitly identified as "seamen" and the fourth simply notes admiralty law's general allowance of contribution claims), the City has not endeavored to do so beyond a dismissive subject heading. (City Reply at 6).[8] It therefore has failed to meet its burden as movant.

### III.   CONCLUSION

---

[8] As with New York's Workers' Compensation Law § 11, the Court has found little guidance for addressing the operation of § 15-108(b) in an action governed by maritime law. However, one decision in this district applied § 15-108(b) to dismiss third party contribution claims despite the fact that the action, "brought under the Jones Act and maritime law, is governed by federal law." <u>Soto v. U.S. Lines, Inc.</u>, 608 F. Supp. 904, 907 (S.D.N.Y. 1985).

For the reasons set forth above, the City's motion for summary judgment (Docket No. 261) is denied. Third-party plaintiffs' cross-motions (Docket No. 278) are denied with leave to renew. The parties are directed to contact the Chambers of Magistrate Judge James Orenstein within 14 days from the date of this Order to schedule a settlement conference.

**SO ORDERED.**

_____/s/_____
SANDRA L. TOWNES
United States District Judge

Dated: September 28, 2012
       Brooklyn, New York